UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 15-10300-DPW


UNITED STATES OF AMERICA


v.


JOHN FIDLER,
DANIEL REDMOND,
ROBERT CAFARELLI,
MICHAEL ROSS and
MARK HARRINGTON

**REPORT AND RECOMMENDATION RE:
DEFENDANTS' MOTION TO DISMISS INDICTMENT
(DOCKET ENTRY # 60)**

**September 1, 2016**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss (Docket Entry # 60) a Superseding Indictment charging defendants John Fidler ("Fidler"), Daniel Redmond ("Redmond"), Robert Cafarelli ("Cafarelli"), Michael Ross ("Ross") and Mark Harrington ("Harrington") (collectively "defendants") with a conspiracy under the Hobbs Act, 18 U.S.C. § 1951, to obtain, by extortion, money paid "as wages for imposed, unwanted, and unnecessary and superfluous services" with the consent of "Company A," a reality television show,[1] "which consent was induced by the wrongful use

---

[1] Defendants represent that the reality television production show is known as "'Top Chef.'" (Docket Entry # 60).

of actual and threatened force, violence, and fear of economic
and physical harm to Company A" (Count One).  (Docket Entry #
34).  Count Two of the Superseding Indictment charges defendants
with an attempted extortion of Company A under the Hobbs Act, 18
U.S.C. § 1951, and aiding and abetting under 18 U.S.C. § 2.[2]

Defendants submit that:  (1) their conduct is protected
under the claim of right defense set out in United States v.
Enmons, 410 U.S. 396 (1973) ("Enmons"); (2) the Superseding
Indictment fails to plead the mens rea element of the charged
offenses that defendants *knew* their actions were not in pursuit
of legitimate labor ends; and (3) the Hobbs Act, as construed in
Enmons and applied to defendants, is void for vagueness.  (Docket
Entry # 60).  In addition to presenting various policy arguments
and outlining the history of federal labor law statutes, an
amicus curiae brief filed by the Massachusetts AFL-CIO ("AFL-
CIO") sets out a preemption argument and further asserts that the
facts alleged in the Superceding Indictment set out lawful
picketing activity and legitimate union objectives of securing
employment for union members.  (Docket Entry # 64).  The AFL-CIO
also elucidates a number of other arguments made by defendants.

## STANDARD OF REVIEW

Defendants move to dismiss the Superseding Indictment

---

[2]  The Superceding Indictment additionally contains
forfeiture allegations.

pursuant to Fed.R.Crim.P. 12(b).  "When a defendant seeks
dismissal of an indictment, courts take the facts alleged in the
indictment as true, mindful that the question is not whether the
government has presented enough evidence to support the charge,
but solely whether the allegations in the indictment are
sufficient to apprise the defendant of the charged offense."
United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015)
(internal quotation marks omitted); United States v. Kilmartin,
99 F.Supp.3d 180, 184 (D.Me. 2015).  An indictment will survive
dismissal "'if it specifies the elements of the offense charged,
fairly apprises the defendant of the charge against which he must
defend, and allows him to contest it without fear of double
jeopardy.'"  United States v. Stewart, 744 F.3d 17, 21 (1st Cir.
2014).  "At the indictment stage, the government need not 'show,'
but merely must allege, the required elements."  Id.  Courts
therefore "'routinely rebuff efforts to use a motion to dismiss
as a way to test the sufficiency of the evidence behind the
indictment's allegations.'"  United States v. Ngige, 780 F.3d at
50 (quoting United States v. Guerrier, 669 F.3d 1, 4 (1st Cir.
2011)).  As explained in Guerrier, "When grading an indictment's
sufficiency," the court examines "whether the document sketches
out the elements of the crime and the nature of the charge so
that the defendant can prepare a defense and plead double
jeopardy in any future prosecution for the same offense."  United

3

States v. Guerrier, 669 F.3d at 3.

An "indictment may use the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." United States v. Savarese, 686 F.3d 1, 6 (1st Cir. 2012).  Reliance on contested and disputed evidence outside an indictment when adjudicating a pre-trial motion to dismiss is not appropriate because it usurps the role of the grand jury and inevitably results in delay of the trial.[3]  See United States v. Gallant, 2010 WL 1533379, at *2 (D.N.H. Apr. 16, 2010) (citing Costello v. United States, 350 U.S. 359, 408-09 (1956)); accord United States v. Welch, 327 F.3d 1081, 1090 (10th Cir. 2003); see, e.g., United States v. Litvak, 2013 WL 5740891, at *6 (D.Conn. Oct. 21, 2013) (denying motion to dismiss indictment and noting that defendant "offers evidence outside of the Indictment" and thus "attempts to put on his case for why his alleged misstatements did not violate section 1031 in a pre-trial motion to dismiss").  Adhering to this framework, the facts, as drawn from the Superceding Indictment, show the following.

FACTUAL BACKGROUND

---

[3]  Defendants' submission of such facts, such as an affidavit (Docket Entry # 71-1), and factual allegations in their briefs therefore do not provide a basis to dismiss the Superceding Indictment.

4

In the spring of 2014, Company A, a producer of a reality television show ("the show"), began scouting locations in the Boston area for filming.  It set up a stage location in Woburn, Massachusetts and also chose to film at a number of locations in and around Boston.  Chosen locations included the Museum of Science, Fenway Park, Cheers, the Omni Parker House hotel, the Menton restaurant and Emerson College.  (Docket Entry # 34, ¶¶ 3, 4).

In May 2014, the company procured the necessary permits from the City of Boston and, notably, it hired its own employees, "including drivers, to produce and participate in the filming of the show."  (Docket Entry # 34, ¶ 5).  The company was not a signatory to a collective bargaining agreement with "[t]he International Brotherhood of Teamsters, Teamsters Local 25 ('Local 25')," a labor organization that represents more than 11,000 union employees to perform, inter alia, transportation and moving services for trade show industries throughout New England.  (Docket Entry # 34, ¶ 1).  Having hired its own employees ("the crew"), the company "did not need any work performed by" members of Local 25.  (Docket Entry # 34, ¶ 5).  In other words, these drivers and other crew members would produce and participate in the show's filming such that there would be no work for Local 25 members to perform.  (Docket Entry # 34, ¶¶ 5, 6).

On June 5, 2014, the crew was in the process of filming the

show "at the Revere Hotel in Boston." (Docket Entry # 34, ¶ 6). Redmond, a member of Local 25, showed up at the location and approached one or more members of the crew. Redmond then demanded that the company hire Local 25 members as drivers and he insisted that one of the show's producers at the location speak to Harrington, who was "the secretary-treasurer of Local 25." (Docket Entry # 34, ¶ 6).

A producer complied with Redmond's demand and spoke to Harrington, presumably by telephone. Harrington told "the producer that he did not care about" the company "and that all he cared about was that some of his [Local 25 union] guys get hired on the show." (Docket Entry # 34, ¶ 6). Significantly, the producer informed Harrington "that all of the drivers had been hired and there was no work for Local 25 to perform." (Docket Entry # 34, ¶ 6). Redmond then made a demand to know the locations where the crew would be filming and he "threatened to shut" down the production that night.[4] (Docket Entry # 34, ¶ 6). Knowing that the company did not need the services of Local 25 union workers, Harrington made additional telephone calls to the

---

[4] Overall, viewed against the charges in counts one and two, these and other statements in the Superceding Indictment therefore disclose that Harrington and his co-defendants were not seeking to *replace* the already hired non-union workers with Local 25 union workers but, instead, were using threats to demand that Company A hire *additional* Local 25 workers for the services performed by the non-union workers even though Company A had no need for such additional, superfluous and unwanted services.

producer that day warning him "they would start to follow them and picket" if the company "did not make a deal with Local 25." (Docket Entry # 34, ¶ 6).  Another union official communicated the same warnings to the producer.  (Docket Entry # 34, ¶ 6).

On June 9, 2014, the City of Boston informed the Omni Parker House hotel that Local 25 was planning to picket the show's filming at the hotel the following day.  On June 9, 2014,  an individual from the hotel notified the company that the hotel would no longer allow the show to use its location because it "did not want to be associated with a Local 25 picket." (Docket Entry # 34, ¶¶ 7, 8).  The company therefore had to find another location and decided to film at a restaurant in Milton, Massachusetts.

In the early morning hours of June 10, 2014, a Local 25 official telephoned and spoke with the same or another producer of the show.  The official informed the producer that the union knew the company was getting ready to film the show at the Milton restaurant and it "would be sending fifty guys to picket." (Docket Entry # 34, ¶ 9).  The company therefore made a decision to hire a police detail for the filming in Milton.

On June 10, 2014, the company was filming the show at the Milton restaurant.  At approximately 9:00 a.m., Redmond, Fidler, Cafarelli, Ross and Harrington, all members of Local 25, arrived at the scene.  Three of them entered the production area and

walked "in lockstep toward the doors of the restaurant where they chest-bumped and stomach-bumped [c]rew members in an attempt to forcibly enter the restaurant." (Docket Entry # 34, ¶ 10).

Throughout the morning, all five defendants both used and threatened "to use physical violence against members of the [c]rew and others." (Docket Entry # 34, ¶ 11). They "yelled profanities" as well as "racial and homophobic slurs" at the crew, blocked vehicles from entering the production area "and used actual physical violence and threats of physical violence to try and prevent people from entering the [production] set." (Docket Entry # 34, ¶ 11). One of the defendants blocked a food truck from delivering food to the crew and at other times defendants were seen in close proximity to vehicles belonging to members of the crew. Nine of those vehicles "were later found to have had their tires slashed." (Docket Entry # 34, ¶ 11).

As charged in Count One of the Superceding Indictment, the five defendants "conspired to obstruct, delay and affect commerce . . ., by extortion, . . . to obtain" the property of Company A, namely, "money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services[,]" and with the consent of the company, "which consent was induced by the wrongful use of actual and threatened force, violence, and fear of economic and physical harm to" the company and others. As part of the conspiracy, defendants "agreed to exert influence through the

wrongful use of actual and threatened force, violence, and fear
or physical and economic harm to" the company "in order to
obtain" the property of the company, to wit, "money to be paid as
wages" for the "imposed, unwanted, and unnecessary and
superfluous services for themselves and other third parties."
(Docket Entry # 34, ¶ 13).

Count Two charges that all five defendants obstructed and
delayed commerce "by extortion, and attempted" extortion by
attempting to obtain the property of the company, to wit, "money
to be paid as wages" for the "imposed, unwanted, and unnecessary
and superfluous services," with the consent of the company, and
that such "consent was induced by the wrongful use of fear and
physical and economic harm to" the company "in order to obtain
wages for such imposed, unwanted, and unnecessary and superfluous
services for themselves, their friends and other third parties."
(Docket Entry # 34, ¶ 15).

<u>DISCUSSION</u>

I.  <u>Claim of Right Defense</u>

Defendants contend they were seeking legitimate labor
objectives by picketing Company A to persuade it to hire union
workers in lieu of non-union workers to perform necessary and
wanted services the company needed and for which it had hired
non-union workers to perform.  Defendants maintain that it is the
services as opposed to the workers that must be unwanted,

9

unnecessary, superfluous and fictitious and that defendants' goal of having Local 25 drivers perform the real and necessary services for Company A falls well within the Enmons claim of right defense.  In addition, recognitional picketing, even if the Local 25 union did not represent a majority (or any) of Company A's employees, is legitimate union activity and therefore beyond the reach of the Hobbs Act, according to defendants.  Defendants further assert that their conduct was an attempt to replace non-union workers with union workers to perform the necessary services, including driving.  As argued by defendants, all of their conduct thus falls within the claim of right defense enunciated in Enmons, to wit, that the Hobbs "Act does not apply to the use of force to achieve legitimate labor ends." United States v. Enmons, 410 U.S. at 401.  Defendants also object to the Superceding Indictment's omission of the word "fictitious" when charging them with exacting the property of Company A in the form of money "paid as wages for imposed, unwanted, and unnecessary and superfluous services" (Docket Entry # 34, ¶¶ 13, 15). (Docket Entry ## 60, 71).  Defendants point out that the language in Enmons requires exacting "'wage' payments from employers in return for 'imposed, unwanted, superfluous *and fictitious* services' of workers."[5]  Id. at 400 (emphasis added).  The AFL-

---

[5]  Defendants correctly state that the Superceding Indictment swaps the term unnecessary for the term fictitious.

CIO echoes and elucidates these arguments, advances a number of policy arguments and asserts a preemption argument.

The government maintains that the Superceding Indictment adequately charges the elements of a Hobbs Act offense and that the charged conduct falls outside the <u>Enmons</u> claim of right defense.  Among other arguments, it asserts that the conduct falls within the example articulated in <u>Enmons</u> of conduct within the reach of the Hobbs Act when unions exact wage payments for imposed, unwanted, unnecessary and superfluous labor without the added requirement of fictitious labor.  The government also maintains that the claim of right defense in <u>Enmons</u> does not reach the use of "extortionate means to force an employer to place a person on [the] payroll solely in exchange for preventing that person or other people or organizations he is associated with from disrupting the work site."  (Docket Entry # 67).  The government argues that the hiring of additional Local 25 union workers to perform the services that the already hired non-union workers would perform rendered the services "unwanted, unnecessary and superfluous."  (Docket Entry ## 67, 78).  The government further contends that the charged conduct demonstrates that defendants were not engaged in recognitional picketing under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158

("section 158").[6]

The Hobbs Act proscribes that, "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . shall be fined . . . or imprisoned."  18 U.S.C. § 1951(a).  The act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

The defendants in <u>Enmons</u> were employees of the Gulf States Utilities Company who "were out on strike" seeking higher wages and other employment benefits.  <u>United States v. Enmons</u>, 410 U.S. at 397-398.  While out on strike, the employees engaged in unequivocal acts of violence by "firing high-powered rifles at three Company transformers, draining the oil from a Company transformer, and blowing up a transformer substation owned by the Company."  <u>Id.</u> at 398.  Examining the language of the definition of "extortion" and, in particular, whether the term "wrongful" applied to the means used to exact the property or to the ends of obtaining the property itself, the Court explained "it would be redundant to speak of 'wrongful violence' or 'wrongful force'"

---

[6] In light of the merit of the above argument, discussed infra, it is not necessary to address the government's additional argument that recognitional picketing does not apply unless Local 25 represented a majority of the employees of Company A.

because "any violence or force to obtain property is 'wrongful.'"
Id. at 400.   Consequently, the term "'wrongful' has meaning in
the Act only if it limits the statute's coverage to those
instances where the obtaining of the property would itself be
'wrongful' because the alleged extortionist has no lawful claim
to that property."  Id.  Hence, the Hobbs Act "does not apply to
the use of force to achieve legitimate labor ends." Id. at 401.
Using violence, even the dramatic violence at issue in Enmons, by
the striking employees to obtain "legitimate union objectives,
such as higher wages in return for genuine services which the
employer seeks," does not violate the statute.  Id. at 400
(affirming district court's dismissal of Indictment).

Having construed the statute's language, the Court provided
two examples of conduct that still fell within the reach of the
Hobbs Act:  (1) "where union officials threatened force or
violence against an employer in order to obtain personal
payoffs"; and (2) "where unions used the proscribed means to
exact 'wage' payments from employers in return for 'imposed,
unwanted, superfluous and fictitious services' of workers." Id.
In setting out the second example, the Enmons Court cited United
States v. Green, 350 U.S. 415, 417 (1956) ("Green"), and United
States v. Kemble, 198 F.2d 889 (3rd Cir. 1952) ("Kemble"), as
exemplifying conduct in which unions exacted wage payments "in
return for 'imposed, unwanted, superfluous and fictitious

13

services' of workers."  United States v. Enmons, 410 U.S. at 400

& n.5.  The Court also discussed Kemble, which affirmed a

conviction of "a union business agent for using actual and

threatened violence against an out-of-town driver in an attempt

to force him to hire a local union member," with approval.  Id.

at 409.  In so doing, the Court quoted the language in Kemble

that omits the word "fictitious," a term that appears nowhere in

the Kemble decision:

> "We need not consider the normal demand for wages as
> compensation for services desired by or valuable to the
> employer.  It is enough for this case, and all we decide,
> that payment of money for imposed, unwanted and superfluous
> services . . . is within the language and intendment of the
> statute."

United States v. Enmons, 410 U.S. at 409 (quoting United States

v. Kemble, 198 F.2d at 892).  Moreover, in discussing the

decision that spawned the Hobbs Act, United States v. Local 807,

315 U.S. 521 (1942), and the legislative framework of the

statute, the Enmons Court similarly omitted any reference to

fictitious services.  See United States v. Enmons, 410 U.S. at

403 ("the limited effect of the bill was to shut off the

possibility opened up by the Local 807 case, that union members

could use their protected status to exact payments from employers

for imposed, unwanted, and superfluous services").  Thus, in

describing conduct that fell within the reach of the Hobbs Act,

the Enmons Court used the terms "imposed, unwanted, superfluous

and fictitious services" interchangeably with "imposed, unwanted

14

and superfluous services." <u>Id.</u> at 400, 403, 409.  The term

"fictitious" was not part of the holding in <u>Enmons</u>.  In short,

"fictitious" is not an element of the offenses charged and

defendants' insistence that the Superceding Indictment's omission

of "fictitious" distorts the meaning of <u>Enmons</u> or otherwise

provides a basis to dismiss the Superceding Indictment is

misplaced.[7]

     Turning to defendants' recognitional picketing argument,

defendants contend they were picketing Company A to hire union

workers and that picketing a non-union employer to recognize or

bargain with a union for up to 30 days without a representative

election is permissible under section 158(b)(7), subject to

certain statutory limitations that do not apply.  (Docket Entry #

71).  Defendants' conduct of engaging in recognitional picketing

and seeking to achieve this legitimate labor end therefore falls

within the claim of right defense and cannot constitute an

illegitimate labor objective, according to defendants.  Extending

the argument, the AFL-CIO maintains that defendants' legitimate

---

     [7]  It is also worth noting that the Indictment challenged
under Fed.R.Crim.P. 29 in <u>United States v. Kirsch</u>, 2015 WL
1472122 (W.D.N.Y. March 31, 2015) ("<u>Kirsch</u>"), a case heavily
relied upon by defendants (Docket Entry ## 60, 71), did not
include the term "fictitious" and one of the counts (Count Two)
survived the motion for a judgment of acquittal.  <u>See</u> <u>id.</u> at *2,
6.  In fact, even though defendants chastise the government for
swapping "unnecessary" for "fictitious," the Indictment in <u>Kirsch</u>
similarly charged Kirsch "with extorting or attempting to extort
property . . . in the form of 'wages . . . for unwanted,
unnecessary, and superfluous labor.'"  <u>Id.</u> at * 2.

conduct in undertaking recognitional picketing necessitates an analysis of unfair labor practices thereby implicating preemption under <u>San Diego Trades Council v. Garmon</u>, 359 U.S. 236 (1959) ("<u>Garmon</u>"). (Docket Entry # 64).

It is true that the Hobbs "Act does not apply to the use of force to achieve legitimate labor ends," <u>United States v. Enmons</u>, 410 U.S. at 401, and that, subject to certain statutory limitations, recognitional picketing of a non-union employer by a union for a time period not to exceed 30 days is not an unfair labor practice. <u>See</u> 29 U.S.C. § 158(b)(7). Generally speaking, picketing in the context of the collective bargaining process of bona fide negotiations between a union and an employer is also a legitimate labor objective even when it engenders violence. <u>See</u> <u>United States v. Gibson</u>, 726 F.2d 869, 872 (1st Cir. 1984) ("picketing may engender violence to persons and to property" and "[i]t is for this reason that the Hobbs Act excludes from its reach 'the use of force to achieve legitimate labor ends'");[8] <u>see</u> <u>also</u> <u>United States v. Enmons</u>, 410 U.S. at 406 n.16 ("when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate"); <u>United States v. Markle</u>, 628 F.3d 58, 62 (2nd Cir. 2010) ("circuit

---

[8]   In <u>Gibson</u>, the personal pay-off implications implicit in the defendant's statement that he would receive a payment to take "care of the 'problem'" placed the demand outside the pursuit of a legitimate labor objective. <u>United States v. Gibson</u>, 726 F.2d at 872.

courts rarely have extended <u>Enmons</u> beyond the context of strikes or collective bargaining negotiations between unions and employers"); <u>United States v. Porcaro</u>, 648 F.2d 753, 760 (1st Cir. 1981).  The conduct set out in the Superceding Indictment, however, readily allows for a finding that defendants were not engaged in recognitional picketing.  Thus, although the Superceding Indictment includes references to picketing (Docket Entry # 34, ¶ 9) (warning Company A that "Local 25 would be sending fifty guys to picket"); (Docket Entry # 34, ¶ 6) ("if Company A did not make a deal with Local 25, they would start to follow them and picket"), it also includes the threat by Redmond "to shut the production down that night" of Company A; that Harrington "did not care about Company A and that all he cared about was that some of his guys get hired on the show";[9] and that Company A had already hired existing, non-union employees to perform the work and participate in the show's filming, hence, there was no services or work for Local 25 members to perform. (Docket Entry # 34).  In fact, "The producer *explained*" to Harrington that "*all* of the drivers had been hired and there was *no* work for Local 25 to perform."  (Docket Entry # 34, ¶ 6) (emphasis added).  Moreover, the charged conduct engaged in at

---

[9]   In other words, Harrington, as "the secretary-treasurer of Local 25," "did not care about Company A" recognizing Local 25 as a union and, instead, only wanted to get "some of his guys hired for the" particular show under production.  (Docket Entry # 34, ¶ 6).

the Milton restaurant does not inevitably bespeak the purpose of
recognizing and bargaining with Local 25 under section 158(b)(7).
Relatedly, the peripheral or collateral nature of the
recognitional picketing conduct as the objective, if *any*,
disclosed in the Superceding Indictment avoids a so-called <u>Garmon</u>
preemption.  <u>See</u> <u>Tamburello v. Comm-Tract Corp.</u>, 67 F.3d 973,
977-78 (1st Cir. 1995) (noting NLRB's primary jurisdiction "does
not apply if the regulated activity is a merely peripheral or
collateral concern," finding <u>Garmon</u> preemption applied when
unfair labor practices implicated for predicate act were not
collateral to civil RICO claim and stating "the problem is that
*none* of this alleged conduct is illegal without reference to the
NLRA") (emphasis added).  The Superceding Indictment thus depicts
conduct in the form of threats used to exact payments in the form
of wages for unwanted, unnecessary and superfluous services that
is a violation of the Hobbs Act.  Having provided adequate notice
to defendants of the conduct upon which the charges of engaging
in unwanted, unnecessary and superfluous services is based, the
Superceding Indictment is not subject to dismissal.[10]

_____

    [10]  This court expresses no opinion on whether the facts at
trial would result in a successful judgment of acquittal based on
defendants engaging in recognitional picketing.  Under the
standard of review applicable to a Fed.R.Crim.P. 12(b) motion,
the Superceding Indictment survives dismissal and sets out a
factual scenario regarding the illegitimate labor objective of
seeking to exact wage payments from Company A in return for
imposed, unwanted and superfluous services peripheral to
recognitional picketing.  Separately, the AFL-CIO insists that

The AFL-CIO additionally argues that the 1959 enactment of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 522 ("section 522"), criminalizes peaceful picketing and, consequently, "strongly suggests that the Hobbs Act was not to be the vehicle for criminal prosecution of labor protests." (Docket Entry # 87).  A separate statutory section of the LMRDA, however, contains a broad "saving provision applicable to the entire act," namely, 29 U.S.C. § 523(a).  <u>United States v. Local 560</u>, 550 F.Supp. 511, 519 (D.N.J. 1982), <u>aff'd</u>, 780 F.2d 267, 283 (3rd Cir. 1985).  Moreover, the introductory statutory section of the LMRDA, which declares the Congressional findings, purposes and policies, describes the Congressional findings as requiring "*further* and *supplementary* legislation . . .."  29 U.S.C. § 401(b) ("section 401(b)") (emphasis added); <u>see United States v. Local 560</u>, 550 F.Supp. at 519 & n.15 (citing additional legislative history as evidence that LMRDA designed "'to supplement'" Hobbs Act and also quoting section 401(b)).  As explained in <u>Local 560</u>, the legislative history indicates that the enactment of section 522 "'would not weaken or change the Hobbs Act.'"  <u>United States v. Local 560</u>, 550 F.Supp. at 522

---

prosecuting defendants' conduct of recognitional picketing will chill legitimate union activities given the prospect of a federal felony conviction under the Hobbs Act.  To a certain extent, however, the assurance of proper jury instructions, if supported by the evidence, as well as the jury system itself should assuage the concern.

(quoting Senator John F. Kennedy's comments about relationship
between Hobbs Act and "extortionate picketing provision which
became section 522").  Thus, by "enacting section 522, . . .
Congress was ensuring . . . that that section would operate in
tandem with the Hobbs Act."  Id. at 523 (discussing in depth the
interplay between provisions in LMRDA and Hobbs Act and rejecting
preemption or implied repeal argument regarding different
provision of LMRDA in civil RICO case).  The AFL-CIO's LMRDA
argument therefore fails to provide a basis to dismiss the Hobbs
Act charges in the Superceding Indictment.[11]  See id.

Defendants also assert that employing a picket line to
persuade Company A to replace the non-union workers with union
workers from Local 25 is categorically beyond the reach of the
Hobbs Act.  Because defendants "sought real jobs for services
actually wanted and needed by Company A," their conduct seeking
to replace non-union workers with union workers constitutes
legitimate union objectives, according to defendants.

Here again, defendants overstate the import of the conduct
charged in the Superceding Indictment.  As indicated in the
Superceding Indictment, Company A had no need for the additional
services being forced upon it by Harrington and Redmond.  As

---

[11]  To the extent not addressed expressly, this court has
considered all of the policy arguments raised by the AFL-CIO and
concludes they do not lead to dismissal of the Superceding
Indictment.

likewise demonstrated in the Superceding Indictment, the services were superfluous because Company A already had workers engaged and performing the services and it was being forced to hire additional union workers to perform additional, duplicative services in order to avoid a shut down of the production.[12]  The Superceding Indictment discloses that:  Harrington had no interest in Company A; the company had hired all of the drivers it needed thus rendering the services that "some [union] guys" would perform superfluous; and Redmond threatened to shut down the production that evening if Company A did not hire Local 25 guys for these unwanted, unnecessary and superfluous services. Whereas "unwanted, unnecessary, and superfluous labor does *not* include the replacement of a non-union worker with a union worker to perform genuine, needed work," United States v. Kirsch, 2015 WL 1472122, at *5 (emphasis added), the facts in the Superceding Indictment encompass conspiring to force Company A to hire additional union workers to stave off disruption at the filming work site in Milton to perform additional (i.e., unwanted, necessary and superfluous) services and thus depicts conduct within the reach of the Hobbs Act.  See United States v. Kemble,

---

        [12]  Separately, this court agrees with defendants that it is the services as opposed to the worker or laborer that must be unwanted, unnecessary and superfluous.  See United States v. Kirsch, 2015 WL 1472122, at *3 ("the term 'labor' in the phrase 'unwanted, unnecessary, and superfluous labor' must refer to the work to be performed (i.e., services of laborers) rather than to a particular laborer").

198 F.2d at 890 (noting that jury could reasonably conclude "that Kemble, understanding that Leonard did not want or need a helper and was not authorized to employ one, nevertheless forcibly insisted that Leonard pay $10, described as a day's wages, for a supernumerary to do what Leonard himself was paid to do and was accomplishing when Kemble intervened"); accord United States v. Enmons, 410 U.S. at 400, 409 & n.5; see also United States v. Kirsch, 2015 WL 1472122, at *4-5 (collecting and distinguishing cases in which the "replacement" workers involved additional workers).  Thus, although Company A had a genuine or "real" need for the services being performed by the existing workers, it did not have any need for the additional and imposed services forced upon it to stave off disruption at the work site of a production shut down.  Inasmuch as the Superceding Indictment thus "describes the statutorily defined elements of the charged crimes, the general factual scenario on which the charges rest, and the connection between those elements and facts," United States v. Savarese, 686 F.3d at 8, defendants' arguments do not warrant dismissal.[13]

II.  Mens Rea

Defendants next argue that the Superseding Indictment fails to plead the essential element of mens rea in counts one and two.

---

[13]  A number of the cases defendants cite do not involve a motion to dismiss an Indictment and therefore do not invoke the same standard of review applicable to defendants' motion.

Neither count includes the essential knowledge element that defendants knew their actions were not in pursuit of legitimate labor ends, according to defendants. (Docket Entry ## 60, 71). The government maintains that the necessary element of mens rea or scienter is embodied in the Superceding Indictment's use of the term "wrongful." (Docket Entry # 67). The government also submits that the Superceding Indictment does not need to expressly state that defendants knew their actions were in pursuit of illegitimate union objectives when the facts import such knowledge. (Docket Entry # 67). The government further asserts that the requirement that it prove defendants knew their actions were in pursuit of illegitimate union objectives applies only in the context of economic harm as opposed to physical harm. (Docket Entry # 67). Defendants disagree. (Docket Entry # 60, pp. 17-18).

"[A]n indictment is sufficient if it specifies the elements of the offense charged" and "fairly apprises the defendant of the charge[s] . . .." United States v. Stewart, 744 F.3d at 21. The Hobbs Act outlaws "attempted extortion affecting interstate commerce" and defines "extortion as 'the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . ..'" Sanchez v. Triple-S Management, Corp., 492 F.3d 1, 12 (1st Cir. 2007) (quoting section 1951(b)) (internal citations omitted). The mens

rea for the offense is one of "specific intent." United States v. Boylan, 898 F.2d 230, 253 (1st Cir. 1990) ("[n]o matter what type of extortion is alleged, specific intent is part . . . of a Hobbs Act conviction"). The wrongful use of fear may encompass economic fear and, when it does, "the wrongfulness element requires the government to establish that the defendant knew that he had no legitimate claim of right to the property in question." United States v. Sturm, 870 F.2d 769, 777 (1st Cir. 1989). In other words, the requisite intent with respect to extortion based on economic fear requires the government to prove "that the defendant *knew* that he was not legally entitled to the property." Id. (emphasis in original).

It is well established that, "Indictments . . . need not always plead required scienter elements in precise statutory terms such as 'willfully' or 'knowingly' so long as other words or facts contained in the indictment 'necessarily or fairly import guilty knowledge.'" United States v. McLennan, 672 F.2d 239, 242 (1st Cir. 1982). The facts in the Superceding Indictment state that Harrington told "the producer that he did not care about Company A and that all he cared about was that some of his guys get hired on the show," at which point, "[t]he producer explained that all of the drivers had been hired and there was no work," i.e., services, "for Local 25 to perform." (Docket Entry # 34, ¶ 6). Redmond thereafter demanded to know

24

where else the crew would be filming and "threatened to shut the production down that night." (Docket Entry # 34, ¶ 6).  The factual scenario therefore depicts that Harrington and Redmond *knew* they had no legal right to have some Local 25 guys hired to perform the additional, unneeded services.  Nevertheless, Redmond demanded that Company A hire the additional Local 25 workers to perform the superfluous services with the threat of shutting the company down that night.  (Docket Entry # 34, ¶ 6).  Coupled with the charges that defendants conspired "by extortion" and attempted to obtain the wages for the superfluous services with Company A's consent "induced by *wrongful* use of fear of physical and economic harm" to the company (Docket Entry # 34, ¶¶ 13, 15) (emphasis added), the Superceding Indictment adequately specifies the elements of the Hobbs Act, including the mens rea, and fairly apprises defendants of the two charges.  On a motion to dismiss an Indictment, no more is required.

III.  <u>Void for Vagueness</u>

     Defendants submit that the Hobbs Act, as construed in <u>Enmons</u> and applied to defendants, is void for vagueness.  They argue that the <u>Enmons</u> Court did not define "legitimate labor ends," except for the two, aforementioned examples, and that, as applied to this case, the statute is void for vagueness because "it fails to provide persons of ordinary intelligence with fair notice that the conduct charged in this case violates the Hobbs Act."

25

(Docket Entry # 60).  Consistent with the arguments addressed under Roman numeral I, defendants assert they were "seeking to replace non-union workers with union workers" and were "engaged in lawful recognitional picketing."  (Docket Entry ## 60, 71).  As a result, there was purportedly no fair notice or warning to a reasonably intelligent person that the charged conduct violated the Hobbs Act as opposed to another statute, such as a state statute criminalizing assault and battery.  (Docket Entry ## 60, 71).  Relying on United States v. Lanier, 520 U.S. 259, 266 (1997) ("Lanier"), defendants further assert that the three related manifestations of the vagueness doctrine in Lanier uniformly show a lack of fair notice.  Relatedly, they contend that the statute's lack of scienter regarding defendants' knowledge that the objective of their conduct was not a legitimate labor end adds to the statute's vagueness.  They also maintain that the First Amendment implications of the charged conduct, which involve picketing, necessitate a greater specificity.  (Docket Entry ## 60, 71).

The government responds that the Hobbs Act requires it to establish specific criminal intent or that the "conduct be committed 'knowingly'" which "usually precludes a finding of vagueness."  (Docket Entry # 67).  The government points out that defendants' conduct of demanding wages for *additional*, superfluous labor falls squarely within the reach of the Hobbs

26

Act, a statute enacted to correct the decision in <u>Local 807</u> that allowed union members to use their status to exact payments for unwanted and superfluous services. (Docket Entry # 67). The government also notes that judicial decisions have clarified "that the Hobbs Act prohibits the conduct alleged in the [Superceding] Indictment, i.e., the use of threats of violence and economic harm to force an employer to place a person on his or her payroll solely in exchange for preventing that person . . . from disrupting the work site." (Docket Entry # 67). These decisions, in turn, gave defendants fair warning that the Hobbs Act prohibited their conduct.

The Due Process Clause of the Fifth Amendment gives defendants the "'right to fair warning of that conduct which will give rise to criminal penalties.'" <u>United States v. Paz-Alvarez</u>, 799 F.3d 12, 28 (1st Cir. 2015), <u>cert. denied</u>, 136 S.Ct. 1224 (2016). Defendants emphasize "the aspect of the fair warning requirement that 'bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."'" <u>Id.</u> (quoting <u>United States v. Lanier</u>, 520 U.S. at 266). Defendants accurately state that <u>Lanier</u> interprets the vagueness doctrine as giving rise to:

> three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence

27

must necessarily guess at its meaning and differ as to its application.[14]   Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.   Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

United States v. Lanier, 520 U.S. at 266 (internal citations and

quotation marks omitted); accord United States v. Paz-Alvarez,

799 F.3d at 28 n.15 (quoting these three manifestations set out

in Lanier).

Overall, "the touchstone is whether the statute, either

standing alone or as construed, made it reasonably clear at the

relevant time that the defendant's conduct was criminal."   United

States v. Lanier, 520 U.S. at 267.   As recently expressed by the

Supreme Court, a criminal statute is unconstitutionally vague

when it "'fails to give ordinary people fair notice of the

conduct it punishes, or [is] so standardless that it invites

arbitrary enforcement.'"   Welch v. United States, 136 S.Ct. 1257,

1262 (2016) (quoting Johnson v. United States, 135 S.Ct. 2551,

2556 (2015)); accord United States v. Morosco, 822 F.3d 1, 5 (1st

Cir. 2016); see Kolender v. Lawson, 461 U.S. 352, 357 (1983)

---

[14]   The first manifestation devolves into two components: "the notice must be clear to the offender and sufficiently clear as to avoid arbitrary and discriminatory enforcement."   Butler v. O'Brien, 663 F.3d 514, 519 (1st Cir. 2011).

(vagueness "doctrine requires that a penal statute define the
criminal offense with sufficient definiteness that ordinary
people can understand what conduct is prohibited and in a manner
that does not encourage arbitrary and discriminatory
enforcement").  Judicial decisions construing the statute may
clarify its contours and thereby provide the necessary fair
warning.  United States v. Paz-Alvarez, 799 F.3d at 28; see
Robinson v. Berman, 594 F.2d 1, 2 (1st Cir. 1979) ("statute whose
terms have a commonly understood meaning or have been clarified
by judicial explanation or by application to particular conduct
is not unconstitutionally vague"); see also United States v.
Smith, 985 F.Supp.2d 547, 588 (S.D.N.Y. 2014) ("judicial
decisions need not have been issued by the Supreme Court")
(citing and quoting Lanier, 520 U.S. at 268-69, in
parenthetical).  A scienter requirement may also mitigate a
statute's vagueness.  United States v. Bay State Ambulance and
Hospital Rental Services Inc., 874 F.2d 20, 32 (1st Cir. 1989)
("'a scienter requirement may mitigate a law's vagueness,
especially with respect to the adequacy of notice to the
defendant that his conduct is proscribed'") (internal brackets
omitted); accord United States v. Nieves-Castano, 480 F.3d 597,
603 (1st Cir. 2007) ("scienter requirement ameliorates any
vagueness concerns").

Turning to defendants' arguments, the statute, as construed

29

by Enmons, "does not apply to the use of force to achieve
legitimate labor ends" and does "not sweep within its reach
violence during a strike to achieve legitimate collective-
bargaining objectives."   United States v. Enmons, 410 U.S. at
401, 404.   The Enmons decision, however, reaffirmed the prior
case law that the statute reached the two examples of "personal
payoffs" and exacting "'wage' payments from employers in return
for 'imposed, unwanted, superfluous and fictitious services' of
workers."   Id. at 400.   Furthermore, the discussion of the Local
807 case in Enmons discloses that the Hobbs Act was designed "to
shut off the possibility opened by the Local 807 case" in which
exacting payments from the existing "out-of-town truckers in
return for the unwanted and superfluous service of driving" the
trucks to and from the city fell within the prior exception in
the predecessor statute for "'payment of wages by a bona-fide
employer to a bona-fide employee.'"[15]   United States v. Enmons,
410 U.S. at 401.   Likewise, the discussion of the Kemble case by
the Enmons Court discloses that a union agent's use of actual and
threatened violence to force an out-of-town driver to hire a
union member for work being performed by the existing out-of-town
driver constituted "'payment of money for imposed, unwanted and

---

[15]   A number of the union teamster drivers in Local 807 did
not drive the trucks and disappeared without performing any
services after collecting the fees.   In other instances, however,
the teamsters did perform the unwanted and superfluous service of
driving the trucks into the city.   Id. at 402.

superfluous services'" proscribed by the Hobbs Act.  <u>United
States v. Enmons</u>, 410 U.S. at 409.

In the case at bar, the Superceding Indictment charges
defendants with:  conspiring or attempting to force Company A to
pay wages to "some of [Harrington's] guys"; being informed that
the company had hired and did not need these Local 25 workers to
perform any work, i.e., services; and threatening the shut down
of production that night.  (Docket Entry # 34).  The crew was in
the process of filming at the Revere Hotel at the time.  Forcing
Company A to place some Local 25 guys on the payroll to stave off
the threatened disruption of an immediate production shut down
that night when "there was *no* work for Local 25 to perform"
because the company had hired "*all* of the drivers" and the crew
was performing the work (Docket Entry # 34, ¶¶ 5, 6) (emphasis
added) is sufficiently similar to the proscribed Hobbs Act
conduct at issue in <u>Kemble</u>.  See <u>United States v. Kemble</u>, 198
F.2d at 890-892.  As further indicated in Roman numeral I, the
<u>Enmons</u> Court's discussion of <u>Kemble</u> and the <u>Local 807</u> case as
well as the <u>Kemble</u> decision itself provide fair notice to persons
of common intelligence that forcing a non-union company to pay
money in the form of wages for unwanted services for additional
(as opposed to replacement) workers to perform unnecessary work
already being performed by existing, hired workers to avoid a
threatened shut down of production falls within the reach of the

statute. As also previously discussed, the facts alleged in the Superceding Indictment do not inevitably or solely depict recognitional picketing as the objective. In short, as applied to this case, the Hobbs Act, as construed by the foregoing judicial decisions, provides fair notice to individuals of common intelligence of the punishable conduct and is not so standardless that it invites arbitrary enforcement. Likewise, in light of these judicial decisions, applying the Hobbs Act to such conduct is not a novel construction.

Defendants' rule of lenity argument is also not convincing as a means to render the statute unconstitutionally vague. First, the Court in Enmons found the term "wrongful" in the statute sufficiently clear, see United States v. Enmons, 410 U.S. at 397-410, and only addressed the rule of lenity thereafter based on an assumption that "the language and history of the Act were less clear than we have found them to be." Id. at 411. The terms "extortion" and "wrongful" are relatively clear inasmuch as wrongful limits the statute's coverage to instances where obtaining the property itself would be wrongful because the defendants have no lawful claim of right to the property. See id. at 400. Indeed, as expressed by the statute's sponsor, "the terms extortion and robbery 'have been construed a thousand times by the courts. Everybody knows what they mean.'" United States v. Jackson, 180 F.3d 55, 69 (2nd Cir. 1999) (quoting

Representative Hobbs' remarks in 91 Cong. Rec. 11,912 (1945));
see Robinson v. Berman, 594 F.2d at 2 ("statute whose terms have
a commonly understood meaning . . . is not unconstitutionally
vague"); see also United States v. Carrigan, 724 F.3d 39, 49 (1st
Cir. 2013); United States v. Tobin, 552 F.3d 29, 34 (1st Cir.
2009).  It is also worth noting that the rule of lenity "only
applies if 'there is a grievous ambiguity or uncertainty in the
statute.'"  United States v. Councilman, 418 F.3d 67, 83 (1st
Cir. 2005) (discussing rule of lenity under Lanier, 520 U.S. at
22) (emphasis in original).

    Second, to the extent defendants' rule of lenity argument
depends upon the "fact" that they were engaged in using force to
achieve legitimate labor ends, it presents a fact-based question
dependent on evidence elicited at trial.  See United States v.
O'Brien, 994 F.Supp.2d 167, 191 (D.Mass. 2014) (rejecting
vagueness and rule of lenity argument because Indictment was
valid on its face as an issue of law and otherwise was
"fact-based question that is dependent on the evidence elicited
at the trial"); United States v. Harris, 2012 WL 2402788, at *1
(D.Mass. June 26, 2012) (noting that court previously "considered
the argument that the wire fraud statute was unconstitutionally
vague, but found that this contention would need to be decided in
the context of the evidence presented at trial").  Defendants'
argument that the Superceding Indictment charges them with

violating the Hobbs Act because they picketed the company to recognize the union or to replace non-union workers with Local 25 workers entails a one-sided, premature view of disputed facts. See also United States v. Cleveland, 1997 WL 180483, at *7 (E.D.La. Apr. 15, 1997) (rejecting vagueness argument as "bound up with factual issues"); see generally United States v. Ford, 2016 WL 4443171, at *14 & n.9 (D.Or. Aug. 22, 2016).

Furthermore, the scienter required under the Hobbs Act, which defines extortion in terms of "*wrongful* use," 18 U.S.C. § 1951 (emphasis added), further dispels any fair warning concerns. See generally United States v. Nieves-Castano, 480 F.3d at 603; United States v. Bay State Ambulance and Hospital Rental Services, Inc., 874 F.2d 20, 33 (1ˢᵗ Cir. 1989).  Indeed, "No matter what type of extortion is alleged, specific intent is part and parcel of a Hobbs Act conviction." United States v. Boylan, 898 F.2d at 253 (citing cases involving extortion under color of official right and extortion through fear of economic loss). Where, as here, the facts in the Superceding Indictment depict the use of economic fear, "the intent component of the wrongfulness element requires the government to establish that the defendant knew that he had no legitimate claim of right to the property in question." United States v. Sturm, 870 F.2d at 777.

Turning to defendants' First Amendment argument, it is true

that, "when a statute 'interferes with the right of free speech
or of association, a more stringent vagueness test should
apply.'"   Holder v. Humanitarian L. Project, 561 U.S. 1, 19
(2010).   Absent First Amendment considerations, a court tests a
statute's clarity "as applied *to the particular facts at issue*."
United States v. Zhen Zhou Wu, 711 F.3d 1, 15 (1st Cir. 2013)
(emphasis in original); United States v. Cintolo, 818 F.2d 980,
996 (1st Cir. 1987) (absent "any first amendment considerations,"
court tests "statute's clarity only as applied to the facts of
this case").   In the case at bar, the specific intent and
wrongfulness requirement of the Hobbs Act not only renders the
statute less vague, it "ensures that its application is
sufficiently constrained to reach only nonprotected speech."
United States v. Coss, 677 F.3d 278, 290 (6th Cir. 2012)
(vagueness challenge to 18 U.S.C. § 875(d)); cf. McCullen v.
Coakley, 134 S.Ct. 2518, 2526 (2014) (statute which, "by its very
terms," prohibited person from knowingly "'enter[ing] or
remain[ing] on a public way or sidewalk adjacent to a
reproductive health care facility within a radius of 35 feet'"
implicated First Amendment because public ways and sidewalks have
"historic role as sites for discussion and debate").   Moreover,
the charges in the Superceding Indictment set out a conspiracy or
attempted extortion based on the use of threat[s] to shut down
the company's production to induce the company to pay wages to

35

defendants' friends or Local 25 members for unwanted, unnecessary and superfluous services when "there was no work" and the company had hired all of its crew who, in turn, were engaged in performing the services. (Docket Entry # 34). Finally, in light of what the government will need to prove at trial, the AFL-CIO's concern that this prosecution will chill recognitional activity or organizational activity such as picketing is overstated.[16] See United States v. Triumph Capital Group, Inc., 260 F.Supp.2d 444, 457 (D.Conn. 2002) ("government will have to prove a quid pro quo in connection with the alleged campaign contributions and the jury will be instructed that a quid pro quo is required for conviction" and thus there is "no danger that the defendants could be convicted merely for making legitimate campaign contributions or for exercising their First Amendment rights").

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[17] that the motion to dismiss (Docket Entry # 60)

---

[16]  See also footnote ten.

[17]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included.  See Fed.R.Crim.P. 59(b)(2) ("Rule 59").  Failure to file objections within this specified time in accordance with Rule 59 "waives a party's right to review."  Fed.R.Crim.P. 59(b)(2).

be **DENIED**.

                                         __ /s/ Marianne B. Bowler ____
                                         **MARIANNE B. BOWLER**
                                         United States Magistrate Judge